**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR ARREST WARRANT**

I, Alexander A. Miris, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Aiden DAVIDSON (a/k/a Hamed ALIABADI), with the offense of Conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.

2.     As shown herein, there is probable cause to conclude that DAVIDSON, between in or about March 2014 and until at least in or about February 2017, willfully conspired with others known and unknown to export and cause to be exported, directly or indirectly, from the United States to the Islamic Republic of Iran, heavy machinery equipment that included Department of Defense (DOD) surplus items, without prior authorization from the United States Department of Treasury, Office of Foreign Assets Control (OFAC), and to engage in transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including prohibitions against the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

3.     I am a Special Agent ("SA") of the United States Department of Homeland Security, Homeland Security Investigations, Manchester, New Hampshire RAIC, and have been a federal investigator since 1996.   Among other things, I am responsible for conducting and assisting in investigations of violations of U.S. export control laws.   During my employment as a Special Agent, I have participated in the execution of numerous search warrants, arrest warrants, and physical surveillance operations.   In addition, I have training and experience in interviewing

1

and debriefing defendants who have violated federal law. In connection with my duties and responsibilities as a law enforcement officer, I have testified in judicial proceedings and prosecutions.  Through such investigations and training, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

4.      I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. In addition, I have received information from other federal law enforcement officials, federal government officials, and industry sources. I also have reviewed documents obtained during the course of the investigation. The statements contained in this affidavit are based on my own observations and review of documents, or reliable information provided to me by the other personnel identified above. This affidavit is being submitted for the limited purpose of establishing probable cause for an arrest warrant. Accordingly, while this affidavit contains material information I am aware of that is pertinent to the requested warrant, it does not include every fact known by me or other investigators concerning the investigation. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## RELEVANT EXPORT STATUTES AND REGULATIONS

5.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic restrictions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and

2

prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

Section 1705 provides in pertinent part:

(a)     It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

(b)     A  person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

6.     On March 15, 1995, President William Jefferson Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059, was in effect at all times relevant to this investigation.  Presidents George W. Bush and Barack Obama continued and maintained the restrictions instituted against Iran by President Clinton. To date, President Donald Trump has also continued and maintained the restrictions.

7.     Executive Order Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic restrictions on Iran.  The Executive Orders prohibited, among other things, the exportation, re-export, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the

United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

8.      The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, implementing the restrictions imposed by the Executive Orders.

9.      The ITSR prohibited, among other things, the export, re-export, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through the Office of Foreign Assets Control.  The Executive Orders and the ITSR were in effect at all times relevant to this investigation.

10.     The ITSR imposed, among others, the following prohibitions:

Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, or Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by OFAC], the exportation, re-export, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is

4

prohibited, including the exportation, ... sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

>        (a)        Such goods, technology, or services are intended specifically for supply ... directly or indirectly, to Iran or the Government of Iran ...

> Section 560.206 - Prohibited trade-related transactions with Iran; goods, technology or services:

> Except as otherwise authorized [by OFAC], ... no United States person, wherever located, may engage in any transaction or dealing in or related to ... goods, technology or services for exportation, re-export, sale or supply, directly or indirectly, to Iran or the government of Iran.

### REPORTS OF THE AUTOMATED EXPORT SYSTEM (AES)

11.        Pursuant to United States law and regulations, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are filed electronically through the Automated Export System administered by the U.S. Department of Homeland Security ("DHS"), in Washington, D.C. One such required filing is the Electronic Export Information ("EEI"), formerly known as a Shipper's Export Declaration. The EEI must be filed when the value of the commodity classified under each individual Schedule B number is over $2,500 or if a validated export license is required to export the commodity. The Schedule B number is a 6 digit international export code to identify the goods being exported.  In such a standard export transaction, the exporter or the U.S. Principal Party in Interest (USPPI) is responsible for preparing the EEI.

12.     An essential and material part of the EEI as well as other export filings is information concerning the end-user or ultimate destination of the export. In many cases, the identity of the end-user determines:

      (a)     Whether the goods may be exported without any specific authorization from the U.S. government;

      (b)     Whether the goods may be exported only with the specific authorization of or a validated license from the Commerce Department, Treasury Department, or State Department, or;

      (c)     Whether the goods may not be exported from the United States.

13.     When submitting an EEI through the Automated Export System, the exporter or entering party must certify that all statements made and all information contained therein is true and correct. The exporter or entering party is also informed that submitting false or fraudulent statements is punishable by both civil and criminal penalties under 13 U.S.C. § 305, 22 U.S.C. § 401, 18 U.S.C. § 1001 and 50 U.S.C. App. 2410.

## Background of Investigation

14.     In 2016, the Department of Commerce (DOC), Office of Export Enforcement (OEE), and the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) initiated an investigation that was developed through information provided by analysts from the DOC's Office of Export Analysis (OEA). The information was gathered via the AES, which revealed seven (7) EEI filings in which GOLDEN GATE INTERNATIONAL LLC ("GOLDEN GATE"), located at ▯ Dunbarton Road, Apt 23, Manchester, NH 03102, was listed as the U.S. Principal Party in Interest (USPPI). Further analysis revealed that STARE LOJISTIK ENERJI SANAYI TICARET (a/k/a STARE LOJISTIK ENERJI SANAYI TICARET) ("STARE") in Igdir, Turkey was listed as the ultimate consignee in all seven (7) EEIs.

15.     Investigating agents accessed the STARE website in April 2016, which was in the Turkish language, and reviewed it utilizing a translate function via the Google search engine. The website revealed that the domain STARELOJISTIK.COM is registered in Igdir, Turkey, and is hosted on IP 94.73.147.10, located in Turkey. The search also revealed that STARELOJISTIK.COM is registered to [        ]2000@hotmail.com.

16.     According to the website, STARE is an import and export freight forwarder/logistics company, and does not purport to be an end-user or ultimate consignee. According to the "main home page" tab as of April 2016, STARE offers transportation services to Afghanistan, Kazakhstan, Kyrgyzstan, Uzbekistan, Turkmenistan, Tajikistan, Azerbaijan, Georgia, and Iran. Under the "services" tab, the company reiterated offers for affordable transportation/delivery services throughout the Turkic Republics of Iraq and Iran, as well as throughout Europe.

17.     A geolocation analysis for the city of Igdir, Turkey where STARE is located revealed it is in eastern Turkey approximately 30 miles from the Turkish-Iranian border.

18.     A search of the New Hampshire (NH) Department of State, Corporation Division's on-line registry records revealed that GOLDEN GATE is a domestic limited liability company and DAVIDSON is the manager/member and registered agent. In addition, GOLDEN GATE was initially registered in November 2013, and according to the certificate of formation provided by DAVIDSON, the company is involved in the import and export of hydraulic pumps and motors.

19.     In 2012, DAVIDSON, a citizen and national of the Islamic Republic of Iran, became a U.S. legal permanent resident (LPR) by U.S. Citizenship and Immigration Services (USCIS).

20.     In August 2015, DAVIDSON submitted a Form N-400 (Application for Naturalization) to USCIS, in which he provided that he is employed by GOLDEN GATE. Pursuant to the submission of the Form N-400, DAVIDSON was interviewed by USCIS officer(s) in Bedford, NH. During the interview, DAVIDSON was questioned about his employment, to which he stated that he was involved in the domestic and international sale of hydraulic pump parts and that his salary was approximately fifty-five thousand ($55,000) dollars a year, and that he did not ship said items to Iran.

21.     Further review of DAVIDSON's Form N-400 application revealed that it included a Petition for Name Change with the U.S. District Court if New Hampshire, indicating that upon naturalization, Hamed ALIABADI planned to change his legal name to Aiden DAVIDSON. During the interview, DAVIDSON was questioned by USCIS officer(s) about his petition, to which he stated that upon approval for naturalization, he intended to keep both his Iranian and U.S. citizenship, for entering/exiting (crossing) Iran.

22.     On or about November 18, 2016, DAVIDSON became a naturalized U.S. citizen, and his legal name was changed to Aiden DAVIDSON.  Thereupon, in December 2016, DAVIDSON applied for and was issued a U.S. passport.

### Travel History for DAVIDSON

23.     Passenger name record (PNR) checks revealed that on October 6, 2013, DAVIDSON, traveling on his Iranian passport, departed Istanbul International Airport in Turkey (IST), on a Turkish Air flight, and arrived at John F. Kennedy (JFK) International Airport in New York. DAVIDSON was referred to secondary inspection by Customs and Border Protection (CBP) officers, whereupon he declared $15,000 USD to CBP. DAVIDSON stated that he was returning to the U.S. after staying in Turkey and Iran for three months. Thereupon, DAVIDSON filed a FinCEN Form 105, Report of International Transportation of Currency or Monetary

Instruments (CMIR), bearing no. 2013C470115656, for the currency.  DAVIDSON was

admitted and departed the inspection area without further incident.

24.     On or about October 27, 2014, DAVIDSON, traveling on his Iranian passport,

departed Tabriz (TBZ) International Airport in Tabriz, Iran, and arrived at IST Airport in

Turkey. Thereupon, DAVIDSON boarded a Turkish Air flight, and arrived at Boston Logan

International (BOS) Airport in Boston. DAVIDSON was referred to secondary inspection by

CBP officers and stated that he was returning from a six-week trip to Iran, Italy, Spain, France

and Turkey. During the inspection, DAVIDSON indicated to CBP officers that he resided at 

Dunbarton Road, Apt 23 in Manchester, NH. Finally, DAVIDSON provided home telephone

number (603)    -9087 and email       dfxx@gmail.com as his contact references. DAVIDSON

was admitted and departed the inspection area without further incident.

25.     On or about August 15, 2015, DAVIDSON departed TBZ Airport in Iran, and

arrived at IST Airport in Turkey. Thereupon, DAVIDSON boarded a Turkish Air flight, and

arrived at BOS Airport. DAVIDSON was referred to secondary inspection by CBP officers and

stated that he was returning from a trip to Iran and Turkey. He stated that he lived at 

Dunbarton Road Apt. 23 Manchester, NH and that he had a part time job selling hydraulic pumps

on eBay in the U.S. DAVIDSON stated that he didn't work for anybody and had no name for his

business. CBP officers asked DAVIDSON if he exported items to Iran, during which he became

agitated and claimed that CBP had no authority to inspect his baggage. CBP officers again asked

DAVIDSON about his shipping activities, to which he stated that he was not that stupid to do

such a thing. CBP officers noted that DAVIDSON became more irritated and nervous when CBP

was looking at hydraulic manuals and part numbers, diagrams, and pamphlets that were in his

checked baggage. CBP officers advised DAVIDSON about the embargo regulations regarding

Iran. CBP officers did not find any export/import documents, just clothes, nuts, sweets and alcohol. DAVIDSON was admitted and departed the inspection area without further incident.

26.     On or about December 15, 2015, a passenger vehicle bearing NH tag ▮▮1577 arrived at the CBP Highgate Springs Port of Entry (POE) in Swanton, Vermont (VT). Upon arrival in the inspection area, the driver identified himself as DAVIDSON and provided his Iranian passport and U.S. permanent resident card to CBP officers. DAVIDSON stated that he bought industrial parts (electrical or hydraulic), which he sold on eBay. He claimed to sell only within the U.S. because of the hassles of dealing with international transactions. DAVIDSON stated that he was returning from Canada with "Qty of Control Panels" and miscellaneous electrical connections purchased from Ritchie Bros Auctioneers (Canada) LTD, located at 9500 Glenlyon Parkway, Burnaby BC, Canada V5J0C6, and bearing a pickup location of 1373 Rue Briere, Mont-Saint-Hilaire, QC CAN J3H6E9.  DAVIDSON also had in his possession an invoice from CIA Encanteurs Industriels Canadiens Inc., located at 58 De Bresoles, Suite 1, Montreal, Quebec, H2Y1V5. The invoice was for "various surplus parts" which included orbital motors, block valves, and pumps purchased on November 25, 2015, in the amount of $31,993.95 USD. DAVIDSON advised CBP that he was in the process of going through a broker before making arrangements to pick up this shipment. CBP advised that he paperwork also reflected a deposit of $12,000 and two Visa payments of $9,993.95 and $10,000. DAVIDSON was admitted and departed the inspection area without further incident.

27.     According to passenger analysis records maintained by DHS, on or about June 05, 2017, DAVIDSON departed BOS Airport on a Thomas Cook charter (Condor Airlines) flight arriving at Manchester (U.K.) International Airport on June 06, 2017. DAVIDSON was scheduled on a one-way reservation, and travelling on his U.S. passport. Upon arrival in the U.K., DAVIDSON had a scheduled connecting flight to Aberdeen International Airport (DYCE)

in Scotland.  Subsequent PNR checks revealed no additional flight reservations could be located

for DAVIDSON.  Email account ▆▆▆ davidsonn@gmail.com was associated with this

reservation.

28.     On or about July 07, 2017, DAVIDSON, traveling on his U.S. passport, departed

Istanbul Ataturk (IST) International Airport in Turkey, on a Lufthansa flight, and arrived at

Frankfurt International Airport in Germany. Upon arrival, DAVIDSON had a scheduled

connecting Lufthansa flight that arrived at BOS Airport on the same day.

29.     Upon arrival, at approximately 2330 hours, DAVIDSON was referred to

secondary inspection by CBP officers, whereupon he appeared very angry and upset for always

being selected for questioning. Upon inspection, DAVIDSON told CBP officers that his purpose

for travel outside the U.S. was business, in which he stated he sold hydraulic motors.

DAVIDSON also stated he was self-employed with a company named GOLDEN GATE

INTERNATIONAL LLC located at his home in Manchester, NH. DAVIDSON stated he visited

Germany, U.K. and Turkey, but was later asked if he visited any other countries, to which he

replied no.

30.     During the inspection, DAVIDSON stated he became a U.S. citizen in 2016 and

that he was born in Iran. CBP officers asked DAVIDSON if he had an Iranian passport to which

he replied yes and told CBP officers they had no authority to see it. CBP officers then explained

their statutory border inspection authority, and DAVIDSON then provided his Iranian passport

for inspection.  A review of the Iranian passport by CBP revealed that DAVIDSON travelled to

Iran in June 2017 for three weeks. CBP officers then asked DAVIDSON if he had conducted any

business in Iran, to which he stated no, and became very upset.  When asked if he brings any

business to Iran or back to the U.S. from Iran he became very angry and would not discuss any

issues. Finally, CBP officers asked DAVIDSON if he brought anything from the U.S. to Iran or

from Iran to the U.S., to which he stated only toiletries, acknowledging current U.S. embargo

sanctions against Iran. A search of all bags was conducted with negative findings, and

DAVIDSON departed the inspection area without further incident.

**Conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.**

31.    On two prior occasions during this investigation, another investigator in this case

submitted affidavits for search warrants, specifically, on April 21, 2017, in the presence of U.S.

Magistrate Judge Andrea K. Johnstone (Case No. 17-mj-▮ 01-AJ); and on March 23, 2018, in

the presence of U.S. Magistrate Judge Daniel J. Lynch (18-mj-▮-01-DL), which were

authorized by the Court. Those search warrants were executed on web-based email accounts

maintained at Google, Inc., namely ▮ davidsonn@gmail.com and

▮.hamed@gmail.com, two known email accounts associated with DAVIDSON and/or

GOLDEN GATE.  Based on my review of emails obtained pursuant to these search warrants, as

well as other evidence gathered during this investigation, these email accounts provide evidence

concerning DAVIDSON's ownership/control of the accounts and evidence of the nature of

possible illegal activities.

32.    On or about June 28, 2013, DAVIDSON sent an email to

Mash@telprocompanies.com which stated: "…We are interested in MMO Wire Anode 3mm for

Cathodic Protection for Iran market.  Please send me a data spec of your Anode Wire and also

please let me know about your wholesale price in USD delivered to Iran."

33.    On or about July 1, 2013, DAVIDSON sent an email t ▮ uchina@163.com

which stated: "…I am a businessman living in USA.  I am working with different truck tire

brands (like Bridgestone and Michelin) and multiple distributors in different countries.  We are

interested in Double Coin truck tires because of their good quality.  We send out wire transfer

through Dubai or HK.  I am interested to know your wholesale prices in USD for these truck

tires for Iran market…"

34.     On or about July 1, 2013, DAVIDSON sent an email to export@triangle.com.cn

which stated the following: "…I am interested to know your wholesale process in USD for these

Triangle brand truck tires for Iran market…"

35.     Significantly, the search warrants revealed no email correspondence from the

account          davidsonn@gmail.com and          hamed@gmail.com with STARE LOJISTIK

or ARIYANIS GROUP, who were listed as the ultimate consignees for all the prior shipments

exported by DAVIDSON.  From my training and experience, U.S. based companies doing

business overseas communicate via email with their customers during the course of business

transactions.

36.     One email search warrant revealed that on or about April 22, 2015, DAVIDSON

forwarded an email to          _trading_co@yahoo.com, which referenced an update on a

forthcoming export DAVIDSON had organized with Priority Worldwide Services ("Priority") to

ship to Mersin, Turkey. Priority is the freight forwarder DAVIDSON uses to export his

commodities outside the United States.  Priority uses the information in DAVIDSON's Shipper's

Letter of Instruction ("SLI") to file the EEI and arrange the export. I believe the shipment

DAVIDSON was referring to was either the April 30, 2015 or the May 7, 2015 shipment, both of

which were said to contain machinery parts and pumps, according to the EEI filings. The

forwarded email was originally between Priority and DAVIDSON. The email communication

discussed delaying the date to pick up the container being exported, due to delays with the

vessel. Therefore, it appears that DAVIDSON was providing an update to

          _trading_co@yahoo.com about a delay with shipping the container.

37.     In March 2018, agents accessed the BABAZADEH TRADING website, www.gdatbaba.com, which lists an address in Tehran, Iran. The website sells items such as hydraulic pumps, hydraulic motors, control and steering valves, and other hydraulic accessories and tools. Agents were able to see items listed for sale on the website, including items manufactured in the United States.  Some of the items included National Stock Numbers (NSNs) 4320-01-035-6896 and 4320-00-630-9286, which were discovered through photographs posted on the website.

38.     According to the Defense Logistics Agency (DLA), a NSN is simply the unique and official label applied to an item of supply that is repeatedly procured, stocked, stored, issued, and used throughout the federal supply system. When an NSN is assigned to an item of supply, data is assembled to describe the item. Some data elements include information such as an item name, manufacturer's part number, unit price, and physical and performance characteristics. NSNs are an essential part of the U.S. military's logistics supply chain used in managing, moving, storing, and disposing of material.

39.     Since 2014, DAVIDSON has maintained an active registered account as a buyer/reseller with Government Liquidation.  According to its website, Government Liquidation is a liquidity services marketplace and is a contractor of the DLA disposition services for the sale of surplus and scrap assets of the United States DOD. Government Liquidation is an online sales channel that enables surplus buyers to purchase available government assets.

40.     Agents reviewed documents from Government Liquidation that included invoices, end user statements, and a spreadsheet of completed sales to DAVIDSON and GOLDEN GATE. Since 2014, DAVIDSON has purchased approximately 2,700 items from Government Liquidation that are surplus from the DOD. Two completed sales included NSNs 4320-01-035-6896 and 4320-00-630-9286, which were discovered in photographs of items for sale on the

14

BABAZADEH TRADING website.  The majority of the other items that DAVIDSON purchased were classified as demilitarization code A, but some of the items purchased were classified as demilitarization code Q.

41.     Items classified as demilitarization code A, according to the DLA website, are "items subject to the EAR in parts 773-74 of Title 15, Code of Federal Regulations (CFR) (Commerce Control List or EAR99) and determined by the DOD to present a low risk when released out of DOD control. No demilitarization, mutilation or end use certificate is required. May require an export license from DOC."

42.     Further, according to the DLA website, items classified as demilitarization code Q are, "Commerce Control List Items - Mutilation to the point of scrap required outside the United States.  Inside the United States, mutilation is required when the demilitarization integrity code is '3' and mutilation is not required when the demilitarization integrity code is '6.'"

43.     Based on photographs taken in a prior inspection and completed sales information from Government Liquidation, agents were able to compare two more NSNs of demilitarization code A items purchased by DAVIDSON that were located in a container DAVIDSON exported in December 2016. The container was tracked with a GPS tracking device to the Islamic Republic of Iran, as described in paragraphs 101 to 105 of this Affidavit.

44.     One of the items photographed displayed NSN 2590-01-193-1773 and is a drive assembly swing. Government Liquidation invoiced GOLDEN GATE on two separate dates when DAVIDSON purchased the drive assembly swings with NSN 2590-01-193-1773. This NSN item was used by the U.S. Army in heavy expanded mobility tactical truck applications.

45.     The second item photographed displayed NSN 2950-00-430-3080 and is a turbocharger assembly. Government Liquidation invoiced GOLDEN GATE for purchasing

turbocharger assemblies NSN 2950-00-430-3080. This NSN item has been used in diesel engine applications by the U.S. Army, Navy, and Air Force.

46.     During the registration process for an account with Government Liquidation, registrants agree to the terms and conditions associated with purchasing surplus DOD items. In the terms and conditions registrants agree to export restrictions that state, "You may not, without prior U.S. Government authorization, export, re-export, or transfer any goods, software, or technology, either directly or indirectly, to any person, or entity named in the following, but not limited to, OFAC which administers exports to embargoed countries and designated entities." Government Liquidation lists the current embargoed countries (Cuba, Iran, North Korea, Sudan, Syria and Crimea) in the terms and conditions.

47.     The e-mail search warrants (referenced in paragraph 31 of this Affidavit) also revealed multiple email addresses that were later found to be registered to DAVIDSON. One such email address discovered was ▮▮▮other@gmail.com. A Grand Jury Subpoena return for subscriber information related to this account lists a recovery email of ▮▮▮.hamed@gmail.com, a telephone number 603-▮▮-5036, and an alternate email address as Hamed.▮▮▮@phelma.grenoble-inp.fr. Along with this email address, agents discovered other email addresses that DAVIDSON created. Through my training and experience, I know that individuals will create and use multiple email accounts, phone numbers, and aliases to conceal their true identity in an attempt to evade law enforcement.

48.     Agents learned that from January 2013 to July 2016, ▮▮2other@gmail.com and ▮▮▮trading_co@yahoo.com exchanged approximately 1,775 emails. From January 2013 to April 2018, ▮▮2000@hotmail.com and ▮▮▮_trading_co@yahoo.com exchanged approximately 970 emails. From February 2014 to July 2015, ▮▮2other@gmail.com,

_____trading_co@yahoo.com, and _____000@hotmail.com exchanged approximately thirty (30) emails together.

49.     Subsequently, on July 24, 2018, a third search warrant affidavit related to _____2other@gmail.com was submitted to Magistrate Judge Daniel J. Lynch (18-mj ____01-DL), which was authorized by the Court.

50.     Agents reviewed emails from _____2other@gmail.com that are related to seven (7) historical EEI filings from shipments in which GOLDEN GATE was listed as the USPPI and STARE was listed as the ultimate consignee. The EEIs revealed that the shipments contained construction equipment and other machinery, pumps, motors, pneumatic tools, etc.  The method of transportation used for these shipments was via vessel (containerized) through the Savannah, Georgia Port of Export.  The freight forwarding agent was identified as Priority.

51.     In addition, all seven (7) EEIs were assigned license type "C33" and had "NLR" listed in the License Code field. An exporter must report on any required EEI filing to the AES the correct license code/license exception code based on the items being exported. When using the No License Required "NLR" designation for the items that are subject to the EAR but not listed on the Commerce Control List (CCL) (i.e., items designated as EAR99), an exporter uses license code "C33." The CCL is a list of items under the export control jurisdiction of the U.S. Department of Commerce, Bureau of Industry and Security (DOC/BIS). The CCL is found in Supplement No. 1 to part 774 of the EAR; however, exports to an embargoed destination, an end-user of concern or in support of a prohibited end-use may require an export license from the OFAC irrespective of whether they are designated as EAR99 items or are items on the CCL. The seven shipments are described in detail below.

**Shipment 1**

52.     During February 2014, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE (in Turkey) listed as the ultimate consignee.

53.     On or about February 27, 2014, DAVIDSON filled out a SLI and acknowledged that he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

54.     On or about March 10, 2014, an EEI bearing Internal Transaction Number (ITN) X20140310050519 was filed by Priority using information provided by DAVIDSON's SLI for a shipment valued at approximately $130,488 USD. The contents were described as equipment such as motors, pumps, tools, and other miscellaneous items.

55.     On or about March 17, 2014, DAVIDSON sent an email to _____2000@hotmail.com and _____trading\_co@yahoo.com with the Subject line "BOL for 2 containers." The email contained two attachments containing a Bill of Lading and Invoice for the items described in the shipment. The Bill of Lading included a statement that says, "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited." The BOL references container number TGHU8105849 which is the container number listed on the EEI for the first shipment.

56.     Significantly, DAVIDSON communicated with Priority using _____hamed@gmail.com, but communicated with _____2000@hotmail.com and

18

_trading_co@yahoo.com using ____2other@gmail.com. Through my training and experience, I know that individuals will create and use multiple email accounts and aliases to conceal their true identity in an attempt to evade law enforcement.

57.     Prior to the export, DAVIDSON discussed pricing for multiple commodities which included pumps, motors and filters.  The pricing was only discussed with _____trading_co@yahoo.com and not with _____2000@hotmail.com.  The following are examples of communications with Babazadeh only:

a.     On or about February 1, 2014, DAVIDSON sent an email with subject line "Urgent info 1st Feb" which contained the following information:  $22,000 for water pumps; $15,000 for eBay and Paypal pumps and motors; $5,126 for Shipping; $1,400 for 2 containers plus $500 for pallets.  Total: 44,026 USD.

b.     On or about February 13, 2014, DAVIDSON prices 10 pieces of Danfoss Hydraulic Pumps for $275 each.

c.      On or about February 25, 2014, DAVIDSON sent an email with the subject line "Final Balance 26th Feb $ 70,000 including shipping charges based on estimation."  The text of the email included the following:

1. $22,000 Water Pumps

2. Shipping of 11 eaton big pump from residential to commercial address

3. $11,650 Tennessee deal balance

4. $20,125 Volvo plus shipping

5. $7,300 shipping charge for two 40 feet container to Turkey each  $3,650

6. $430-$490 pallet and box charges

7. $1,400-$2,000 charges for 2 containers Tennessee deal

8. Labor work till now (15 days) $2,055

**Shipment 2**

58.     During February 2014, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

59.     On or about February 27, 2014, DAVIDSON filled out a SLI stating that he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

60.     On or about March 14, 2014, an EEI bearing ITN X20140314055899 was filed by Priority using information provided by DAVIDSON's SLI for a shipment valued at approximately $144,625 USD and whose contents were described as equipment such as engines and pumps.

61.     On or about March 17, 2014, DAVIDSON sent an email to _____2000@hotmail.com and _____trading\_co@yahoo.com with the Subject line "BOL for 2 containers." The email contained two attachments containing a Bill of Lading and Invoice for the items described in the shipment. The Bill of Lading included a statement that says, "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."  The BOL references container number ZCSU8726900 which is the container number listed on the EEI for the second shipment.

62.     Significantly, DAVIDSON communicated with Priority using

░░░░░ hamed@gmail.com, and communicated with ░░░░░ 2000@hotmail.com and

░░░░░ _trading_co@yahoo.com using ░░░░░ 2other@gmail.com.

63.     Prior to the export, DAVIDSON discussed pricing for multiple commodities

which included pumps, motors and filters.  The pricing was discussed only with

░░░░░ _trading_co@yahoo.com, and not with ░░░░░ 2000@hotmail.com.

### Shipment 3

64.     During August 2014, DAVIDSON communicated via email with Priority to

facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

65.     On or about August 11, 2014, DAVIDSON filled out a SLI stating that he

"certifies all statements made and all information contained herein are true and correct and that I

have read and understand the instructions for preparation of this document, set forth in the

correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal

penalties, including forfeiture and sale, may be imposed for making false or fraudulent

statements herein, failing to provide the requesting information or for violation of U.S. laws on

exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

66.     On or about August 14, 2014, an EEI bearing X20140814767209 was filed by

Priority using information provided by DAVIDSON's SLI for a shipment valued at

approximately $166,000 USD and whose contents were described as equipment such as

machinery parts, motors, and other miscellaneous items.

67.     On or about October 16, 2014, DAVIDSON sent an email to

░░░░░ 2000@hotmail.com with the Subject line "BOL Ship." The email contained an

attachment containing a Bill of Lading for the items described in the shipment. The Bill of

Lading included a statement that "These commodities, technology, or software were exported

from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."  The BOL references container number BSIU9076344 which is the container number listed on the EEI for the third shipment.

68.     DAVIDSON again communicated with Priority using

.hamed@gmail.com, and communicated with         2000@hotmail.com using

        other@gmail.com.

69.     Prior to the export, DAVIDSON discussed pricing for multiple commodities which included pumps, motors and filters.  The pricing was discussed only with

        _trading_co@yahoo.com and not with         2000@hotmail.com., as shown in the following examples:

> a.     On or about April 25, 2014, DAVIDSON sent an email which contained an attachment. The attachment was an invoice in the amount of approximately $3,301.10 sold to DAVIDSON from the company "Surplus Acquisition Venture DBA, Your Direct Source for U.S. Government Surplus" which included items such as pumps and valves.

> b.     On or about May 8, 2014, DAVIDSON sent an email with the subject line "Auction Invoices," which contained 4 attachments. The attachments were invoices of items sold to DAVIDSON from the company "Surplus Acquisition Venture DBA, Your Direct Source for U.S. Government Surplus which included items such as pumps, valves and motors.

**Shipment 4**

70.     During September 2014, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

71.     On or about September 4, 2014, DAVIDSON filled out a SLI which stated that he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

72.     On or about September 5, 2014, an EEI bearing ITN X20140905939581 was filed by Priority using information provided by DAVIDSON's SLI for a shipment valued at approximately $173,450 USD and whose contents were described as equipment such as machinery parts and pumps.

73.     On or about December 8, 2014, DAVIDSON sent an email to ░░░░░░░░ trading_co@yahoo.com with the Subject line "BOL Turkey." The email contained one attachment containing a Bill of Lading for the items described in the shipment. The Bill of Lading included a statement that says, "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."  On or about December 16, 2014, DAVIDSON sent an email to ░░░░░░ 2000@hotmail.com with the Subject line "Urgent New 2nd Container BOL."  The email contained an attachment with a corrected bill of lading. Both BOLs referenced container number FSCU6772510 which is the container number listed on the EEI for the fourth shipment.

74.     As before, DAVIDSON communicated with Priority using ░░░░░░░ hamed@gmail.com, and communicated with ░░░░░░ 2000@hotmail.com and ░░░░░░░ _trading_co@yahoo.com using ░░░░ 2other@gmail.com.

75.    Prior to the export, DAVIDSON discussed pricing for multiple commodities which included pumps, motors and filters.  The pricing was discussed only with

           trading_co@yahoo.com and not with       2000@hotmail.com.  The following are examples of such communications:

        a.    On or about August 26, 2014, DAVIDSON sent an email with the Subject line "Results" which contained the following information:

1.  76 PCS Rexroth Valve 3 Different Lot ($1,681, $1,681, $1,747).

2.  6 PCS Eaton Rotating 3 Different Lot ($1,463, $1,380, $1,477)

        b.    On or about September 1, 2014, DAVIDSON sent an email with the Subject line "Invoice last week Rexroth" and included an attachment.  The attachment was an invoice for items sold to DAVIDSON from the company "Surplus Acquisition Venture DBA, Your Direct Source for U.S. Government Surplus" which included items such as valves.

## Shipment 5

76.    During September 2014, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

77.    On or about September 23, 2014, DAVIDSON emailed Priority an SLI in which he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

78.     On or about September 25, 2014, an EEI bearing ITN X20140925998128 was filed by Priority using information provided by DAVIDSON's SLI for a shipment valued at approximately $42,500 USD and whose contents were described as equipment such as machinery parts, pumps, and motors.

79.     Prior to the export, DAVIDSON discussed pricing for multiple commodities which included pumps, valves and engines.  The pricing was only discussed with trading_co@yahoo.com and not with 2000@hotmail.com.  The following are examples of such communications:

        a.     On or about October 20, 2014, DAVIDSON sent an email with subject line "invoice 10/20" which has three invoices attached and gives a total of $17,100. The invoices attached were items sold to DAVIDSON from the company "Surplus Acquisition Venture DBA, Your Direct Source for U.S. Government Surplus" which included items such as valves, motors and pumps.

        b.     On or about November 6, 2014, DAVIDSON sent an email with subject line "Result" and lists three separate prices for pumps.

        c.     On or about December 5, 2014, DAVIDSON sent an email with subject as "Result" which lists prices six (6) different pumps, valves, and engines.

**Shipment 6**

80.     During April 2015, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

81.     On or about April 30, 2015, DAVIDSON filled out a SLI stating that he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties,

including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

82.     On or about April 30, 2015, an EEI bearing ITN X20150430518194 was filed by Priority using information provided by DAVIDSON's SLI for a shipment valued at approximately $80,000 USD and whose contents were described as equipment such as machinery parts and pumps.

83.     On or about May 14, 2015, DAVIDSON sent an email to _____trading_co@yahoo.com with the Subject line "Urgent BOL info 5/14 20 PKGS VS 6,350." The email contained one attachment containing a direct container line document. The document included a statement that says, "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."  The attachment referenced container number TCLU5196743 which is the container number listed on the EEI for the sixth shipment.

84.     DAVIDSON again communicated with Priority using _____hamed@gmail.com, and communicated with _____trading_co@yahoo.com using _____2other@gmail.com.

85.     Prior to the export, DAVIDSON discussed pricing for multiple commodities which included pumps and valves.  The pricing was discussed only with _____trading_co@yahoo.com and not with _____2000@hotmail.com.  The following are examples of such communications:

        a.      On or about January 10, 2015, DAVIDSON sent an email with subject line "Result" and gives prices for multiple pieces of two items which total approximately $4,100.

     b.      On or about February 2, 2015, DAVIDSON sent an email with subject line "Result" and gives prices for multiple pieces of two items which total approximately $2,000.

### Shipment 7

86.     During May 2015, DAVIDSON communicated via email with Priority to facilitate a shipment on behalf of GOLDEN GATE with STARE listed as the ultimate consignee.

87.     On or about May 14, 2015, DAVIDSON filled out a SLI which stated that he "certifies all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the correct way to fill out a Shipper's Export Declaration and I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requesting information or for violation of U.S. laws on exportation (13 U.S.C. 305; 22 U.S.C. Sec. 401; 18 U.S.C 1001; 50 U.S.C. App. 2410)."

88.     On or about May 7, 2015, an EEI bearing X20150507880632 was filed by Priority using information provided by DAVIDSON's SLI for shipment valued at approximately $100,000 USD and whose contents were described as machinery parts and pumps.

89.     On or about May 27, 2015, DAVIDSON received an email from Priority with a direct container line document. The document included a statement that says, "These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law is prohibited."  The attachment referenced container number DFSU6302090 and referenced EEI ITN X20150507880632.

90.     On or about May 29, 2015, DAVIDSON forwarded the above email and attachment to himself at ⬛2other@gmail.com.

91.     On or about May 29, 2015, DAVIDSON sent the same email and attachment to
[          ]2000@hotmail.com and [          ]_trading_co@yahoo.com with the Subject line
"Second Container BOL".

92.     As before, DAVIDSON communicated with Priority using
[          ].hamed@gmail.com, and communicated with [          ]_trading_co@yahoo.com using
[          ]other@gmail.com.

93.     Prior to the export, DAVIDSON discussed pricing for multiple commodities.  The
pricing was only discussed with [          ]_trading_co@yahoo.com and not with
[          ]@hotmail.com, as shown in the following example:

On or about April 13, 2015, DAVIDSON sent an email with subject line "Anderson eBay
items bottom price $59,665" and lists multiple pieces of thirty one separate items.

## Money Transactions

94.     A review of the results of the email search warrant revealed multiple emails
between DAVIDSON, [          ]azadeh-corp.com [          ]_trading_co@yahoo.com and
[          ]000@hotmail.com, containing SWIFT banking information, payment confirmations,
and other financial details.  DAVIDSON held bank accounts at Bank of America, with a branch
offices in Manchester and Hooksett, New Hampshire, where he made ATM withdrawals.  There
were multiple emails to DAVIDSON with receipts showing SWIFT payments to GOLDEN
GATE.  The following are examples:

95.     On or about January 4, 2014, DAVIDSON received an email from
[          ]azadeh-corp.com.  The email contained an attachment detailing a single customer
credit transfer of funds from the Hong Kong and Shanghai Banking Corporation Limited, with
the beneficiary customer listed as GOLDEN GATE for the amount of around $20,000 USD.

96.     On or about January 18, 2014, DAVIDSON received an email from

[redacted] azadeh-corp.com. The email contained a document titled "SWIFT Customer Transfer,"

which indicated a payment from VTB Bank (Armenia) in the amount of around $10,000 USD to

Hamed ALIABADI.  The details of payment stated "Educational and living expenses."  Through

my training and experience, I know that individuals will falsely claim the purpose of payment in

an attempt to evade law enforcement.

97.     On or about April 19, 2014, DAVIDSON received an email from

[redacted] azadeh-corp.com containing an attachment which indicated a SWIFT payment of

around $14,000 USD from Juliana Trading Company via PrivatBank IBU, Nicosia, Cyprus to

GOLDEN GATE INTERNATIONAL LLC.  Remittance information states "PMNT FOR

TOOLS."

98.     DAVIDSON sent multiple emails to [redacted]_trading_co@yahoo.com detailing

payments received from BABAZADEH.  On or about September 4, 2015 DAVIDSON sent the

following email to [redacted]_trading_co@yahoo.com and

[redacted]_trading_co@hotmail.com:  "…all is correct expect (sic):

1.   93/03/29 $7,000   USD   Never Received

2.   93/10/22 $10,000 USD   Never Received

3.   94/03/18 $20,000  USD  Never Received"

99.     On or about September 4, 2015 DAVIDSON sent another email to

[redacted]_trading_co@yahoo.com and [redacted]_trading_co@hotmail.com stating the

following: "…Total money received from the list is : $ 688,000 USD – (1,560 USD Wire fees) =

$686,440 USD actually received.  But you have sent me that $ 725,700 USD has been wired

which is wrong and the difference is $ 37,700 USD never received."

100.    On or about September 9, 2015 DAVIDSON sent an email to

_____trading_co@yahoo.com and _____trading_co@hotmail.com listing dates and a

dollar amount for a Personal Account as well as for a Business Account.  DAVIDSON stated

"Total : $391,976 + ($308,000) + ($380,000) = $1,080,000  till today 09/09/15."  Based on a

review of DAVIDSON's bank account information, DAVIDSON received payments from

STARE as recently as February 2017.

**Shipments to Iran**

101.    On or about December 2, 2016, an EEI bearing X20161202732830 was filed in

the AES and listed the ultimate consignee as STARE LOJSTK ENERJ SANAY TCARE located

at _____

Turkey. The USPPI of the filing was GOLDEN GATE of Manchester, New Hampshire. The

merchandise of this filing was loaded into an intermodal (shipping) container, bearing container

#FSCU6701619, and valued at approximately $105,666 USD. According to the EEI, the

described commodities contained in the shipping container were motors, pumps, valves and other

miscellaneous items. The shipment was detained at the Port of Savannah, Georgia, by CBP in

order for investigating agents to inspect the items specified in the EEI to verify if they matched

the contents in the container.

102.    On or about December 9, 2016, an EEI bearing X20161209102232 was filed in

the Automated Export System that listed the ultimate consignee as STARE LOJSTK ENERJ

SANAY TCARE located at the same address as in the above paragraph. The USPPI of the filing

was GOLDEN GATE of Manchester, New Hampshire. The merchandise of this filing was

loaded into an intermodal (shipping) container, bearing container # TEMU2279332, and valued

at approximately $24,928 USD.  According to the EEI, the described commodities contained in

the shipping container were motors, pumps, valves and other miscellaneous items. The shipment

30

was detained at the Port of Savannah, Georgia, by CBP in order for investigating agents to inspect the items specified in the EEI to verify if they matched the contents in the container.

103.    During the facilitation of the December 2016 shipments, investigating agents obtained consent to review email messages between Priority and DAVIDSON. DAVIDSON was then using email            hamed@gmail.com to communicate with Priority and coordinate the export.

104.    On or about December 20, 2016, investigating agents from DOC/OEE, DHS/HSI and DHS/CBP inspected the contents of the two (2) shipping containers and verified that they were consistent with the items specified in the EEIs. During the inspection, investigating agents installed two (2) electronic tracking devices, bearing serial numbers 165758 and 165760, in two separate locations within the contents of container #FSCU6701619. The electronic tracking devices are designed to transmit global positioning system (GPS) signals to satellites that capture their current location and are operated via batteries. No tracking device was placed in the second container, #TEMU2279332.

105.    On or about February 13, 2017, the tracking devices were transmitting signals from Bazargan in the Islamic Republic of Iran. Bazargan is the major land border port for import/export for the Islamic Republic of Iran.  On or about March 16, 2017, the tracking devices were transmitting signals near Tehran in the Islamic Republic of Iran.  Thus, according to the tracking device data, the container never went to STARE LOJSTK ENERJ SANAY TCARE located at                                                           , Turkey, but instead went directly from the Port of Mersin into the Islamic Republic of Iran.

106.    On or about May 3, 2017, an EEI bearing X20170503712836 was filed in the AES and listed the ultimate consignee as ARIYANIS GROUP located at MESIHPASA CAD.

[                              ] in Istanbul, Turkey. According to the

EEI, the shipment consisted of approximately sixty-three (63) displacement pumps and was

valued at approximately $13,000 USD. The USPPI of the filing was listed as GOLDEN GATE.

107.    Agents conducted open source queries via Google to search the address and

company name provided on the EEI. Agents could not find any results for a company named

ARIYANIS GROUP located in Istanbul, Turkey.

108.    During the facilitation of the May 2017 shipment, investigating agents obtained

consent to review email messages between Priority and DAVIDSON. During these

communications, DAVIDSON was using email [    ] davidsonn@gmail.com to communicate

with Priority and instruct the export.

109.    On or about May 17, 2017, investigating agents from DOC/OEE installed a

tracking device inside the shipment DAVIDSON was exporting from the U.S. The tracking

device (Serial # 165756) sends out GPS signals of the current location and operates via batteries.

The tracker was concealed inside a cardboard box that contained the items being exported to

ARIYANIS GROUP.

110.    On or about August 1, 2017, the tracking device was transmitting signals

indicating it was in the Islamic Republic of Iran near the city of Tabriz.

111.    According to the tracking device data, the container went to the city of Tabriz in

the Islamic Republic of Iran and not to the supposed ultimate consignee ARIYANIS GROUP

located at MESIHPASA CAD. [                              ] in

Istanbul, Turkey.

112.    License determinations were submitted to OFAC regarding Hamed ALIABADI

(a/k/a Aiden DAVIDSON) of Manchester, New Hampshire, (d/b/a GOLDEN GATE

INTERNATIONAL). The license determination disclosed that a search by OFAC had no

responsive records of applications submitted by or on behalf of any party named above with respect to the items shipped in containers #FSCU6701619, #TEMU2279332, and #CAIU9342177. An export license was required for some or all of the items shipped in container #FSCU6701619 and #CAIU9342177 because their final destination was the Islamic Republic of Iran.

113.    Based on the signals transmitted and in accordance with applicable geo-mapping software, there is probable cause to suggest that DAVIDSON caused multiple shipments to be diverted to known and unknown consignees or end-users, located in the Islamic Republic of Iran, and that DAVIDSON submitted false paperwork to facilitate diversion to the Islamic Republic of Iran, via Turkey.

### Current Residence

114.    Agents learned through credit bureau reporting checks, that as of October 2017, DAVIDSON was linked to an address located at 2 Rachel Drive,          Jackson, TN 38305. Driver license checks revealed that on October 17, 2017, DAVIDSON was issued a Tennessee driver license, bearing the aforementioned Jackson address, and expiring on October 17, 2025. In addition, checks revealed that DAVIDSON's New Hampshire driver's license has been surrendered.

115.    Agents also learned, as of January, 19, 2018, a company by the name of PHOENIX DEFENSE INC. was incorporated at 2 Rachel Drive,          Jackson, TN 38305.

116.    On August 30, 2018, HSI S/A Miris was notified by DHS' Advance Passenger Information System (APIS), that an exact name match was made based on departure manifest data, specifically, that Aiden DAVIDSON was an exact match, based on name and DOB criteria. The notification also indicated that DAVIDSON is scheduled to depart from Hartsfield-Jackson

Atlanta International Airport on September 02, 2018, on board Turkish Airlines (TK) Flight # 32.

117.    On August 31, 2018, HSI S/A Miris conducted passenger name record (PNR) data checks, which revealed that DAVIDSON, bearing the matching name, DOB and U.S. Passport No. ____ 2000, is ticketed and scheduled to depart Hartsfield-Jackson Atlanta International Airport on September 02, 2018, on Turkish Airlines (TK) flight # 32, arriving at Istanbul Ataturk Airport in Turkey, with a connecting flight on Turkish Airlines (TK) flight # 459 to Boryspil International Airport in Kiev, Ukraine. PNR data also revealed that on September 30, 2018, DAVIDSON is ticketed and scheduled to depart Boryspil International Airport on Turkish Airlines (TK) flight # 458 to Istanbul Ataturk Airport, with a connecting flight on Turkish Airlines (TK) flight # 31, returning to Hartsfield-Jackson Atlanta International Airport on said day. Finally, PNR data revealed that the aforementioned travel itinerary was linked to ____DAVIDSON@OUTLOOK.COM and telephone (615) ___-4238.

### Conclusion

118.    As previously referenced in this affidavit, STARE is an import and export freight forwarder/logistics company in Turkey, and does not purport to be an end-user or ultimate consignee. According to its "main home page" tab, STARE offers transportation services to Afghanistan, Kazakhstan, Kyrgyzstan, Uzbekistan, Turkmenistan, Tajikistan, Azerbaijan, Georgia, and Iran. Under the "services" tab, the company reiterated offers for affordable transportation/delivery services throughout the Turkic Republics of Iraq and Iran, as well as throughout Europe.

119.    As previously referenced in this affidavit, the BABAZADEH TRADING website lists an address in Tehran, Iran. The company sells items such as hydraulic pumps, hydraulic motors, control and steering valves, and other hydraulic accessories and tools.

34

120.    In conclusion, based on the facts summarized above, there is probable cause that DAVIDSON used multiple email addresses to conspire with persons at ▓▓▓▓▓▓▓_trading_co@yahoo.com and ▓▓▓▓2000@hotmail.com to circumvent United States export law by diverting multiple shipments from Turkey into Iran in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.

Respectfully Submitted,

/s/ Alexander A. Miris
Alexander A. Miris
Special Agent
Homeland Security Investigations
Department of Homeland Security

Sworn and subscribed to me before this 31st day of August, 2018, in Concord, New Hampshire.

Andrea K. Johnstone
United States Magistrate Judge